ANDREW L. PACKARD (State Bar No. 168690)
ERIK ROPER (State Bar No. 259756)
EMILY J. BRAND (State Bar No. 267564)
Law Offices of Andrew L. Packard
100 Petaluma Blvd. N Ste 301
Petaluma, CA 94952
Tel: (707) 763-7227
Fax: (415) 763-9227
E-mail: andrew@packardlawoffices.com

Attorneys for Plaintiff CALIFORNIA
SPORTFISHING PROTECTION ALLIANCE

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA SPORTFISHING PROTECTION ALLIANCE, a non profit corporation,<br><br>Plaintiff,<br><br>vs.<br><br>USA WASTE OF CALIFORNIA, INC., a Delaware corporation; JAY RAMOS, an individual; and FELIPE MELCHOR, an individual,<br><br>Defendants. | Case No. 5:12-CV-03283-LHK<br><br>**STIPULATION FOR APPROVAL OF CONSENT AGREEMENT AND DISMISSAL OF PLAINTIFF'S CLAIMS WITH PREJUDICE; [PROPOSED] ORDER GRANTING DISMISSAL WITH PREJUDICE [FRCP 41(a)(2)]** |

TO THE COURT:

Plaintiff California Sportfishing Protection Alliance ("PLAINTIFF" or "CSPA"), and

Defendants USA Waste of California, Inc., Jay Ramos, and Felipe Melchor (collectively,

"DEFENDANTS"), Parties in the above-referenced matter, stipulate as follows:

**WHEREAS**, on or about April 25, 2012, CSPA provided DEFENDANTS with a Notice

of Violations and Intent to File Suit ("60-Day Notice Letter") under Section 505 of the Federal

Water Pollution Control Act ("Act" or "Clean Water Act"), 33 U.S.C. § 1365;

**WHEREAS**, on June 25, 2012, CSPA filed its Complaint against DEFENDANTS in this

Court, *California Sportfishing Protection Alliance v. USA Waste of California, Inc., et al.*

1   (USDC, N.D. Cal., Case No. 5:12-CV-03283-LHK) and said Complaint incorporated by

2   reference all of the allegations contained in CSPA's 60-Day Notice Letter;

3       **WHEREAS**, DEFENDANTS deny any and all of CSPA's claims in its 60-Day Notice

4   Letter and Complaint;

5       **WHEREAS**, CSPA and DEFENDANTS, through their authorized representatives and

6   without either adjudication of CSPA's claims or admission by DEFENDANTS of any alleged

7   violation or other wrongdoing, have chosen to resolve in full by way of settlement the allegations

8   of CSPA as set forth in CSPA's 60-Day Notice Letter and Complaint, thereby avoiding the costs

9   and uncertainties of further litigation.  A copy of the Parties' proposed consent agreement

10  ("Consent Agreement") entered into by and between CSPA and DEFENDANTS is attached

11  hereto as Exhibit A and incorporated by reference.

12      **WHEREAS**, CSPA submitted the Consent Agreement via certified mail, return receipt

13  requested, to the U.S. EPA and the U.S. Department of Justice ("the agencies") and the 45-day

14  review period set forth at 40 C.F.R. § 135.5 has been completed without objection by the

15  agencies.

16      **NOW THEREFORE, IT IS HEREBY STIPULATED** and agreed to by and between

17  the Parties that CSPA's claims, as set forth in its 60-Day Notice Letter and Complaint, be

18  dismissed with prejudice pursuant to Federal Rule of Civil Procedure 41(a)(2).  The Parties

19  respectfully request an order from this Court dismissing such claims with prejudice.  In

20  accordance with Paragraph III.4 of the Consent Agreement, the Parties also request that this Court

21  retain and have jurisdiction over the Parties through September 30, 2015, for the sole purpose of

22

23  ///

24  ///

25  ///

26  ///

27  ///

28

1  resolving any disputes between the parties with respect to enforcement of any provision of the

2  Consent Agreement.

3

4  Dated:  January 24, 2013                    LAW OFFICES OF ANDREW L. PACKARD

5

6                                             By: ___/s/___ Emily J. Brand_____
                                             Emily J. Brand
7                                            Attorneys for Plaintiff
                                             CALIFORNIA SPORTFISHING PROTECTION
8                                            ALLIANCE

9  Dated:  January 24, 2013                    REED SMITH, LLP

10

11                                            By: _____
                                             John Lynn Smith
12                                            Julia C. Butler
                                             Attorneys for Defendants
13                                            USA WASTE OF CALIFORNIA, INC., *et al.*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

STIPULATION FOR APPROVAL OF CONSENT AGREEMENT          CASE NO. 5:12-CV-03283-LHK
AND DISMISSAL; [PROPOSED] ORDER                        3

1

**[~~PROPOSED~~] ORDER**

2

Good cause appearing, and the Parties having stipulated and agreed,

3

IT IS HEREBY ORDERED that Plaintiff California Sportfishing Protection Alliance's

4

claims against Defendants USA Waste of California, Inc., Jay Ramos, and Felipe Melchor as set

5

forth in CSPA's 60-Day Notice Letter and Complaint filed in Case No. 5:12-CV-03283-LHK, are

6

hereby dismissed with prejudice, each side to bear their own attorney fees and costs, except as

7

provided for by the terms of the accompanying Consent Agreement.

8

IT IS FURTHER ORDERED that the Court shall retain and have jurisdiction over the

9

Parties with respect to disputes arising under the Consent Agreement attached to the Parties'

10

Stipulation to Dismiss as Exhibit A. The Clerk shall close the file.

11

IT IS SO ORDERED.

12

13

UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF CALIFORNIA

14

15

16

Dated: January 25, 2013

*Lucy H. Koh*

United States District Court Judge

17

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT A**

ANDREW L. PACKARD (State Bar No. 168690)
ERIK M. ROPER (State Bar No. 259756)
EMILY J. BRAND (State Bar No. 267564)
Law Offices of Andrew L. Packard
100 Petaluma Blvd. N., Suite 301
Petaluma, CA 94952
Tel: (707) 763-7227
Fax: (707) 763-9227
E-mail: Andrew@packardlawoffices.com
           Erik@packardlawoffices.com
           Emily@packardlawoffices.com

Attorneys for Plaintiff
CALIFORNIA SPORTFISHING
PROTECTION ALLIANCE

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA SPORTFISHING PROTECTION ALLIANCE, a non-profit corporation, <br><br> Plaintiff, <br><br> vs. <br><br> USA WASTE OF CALIFORNIA, INC., a Delaware corporation; JAY RAMOS, an individual; and FELIPE MELCHOR, an individual, <br><br> Defendants. | Case No. 5:12-cv-03283-LHK <br><br> [~~PROPOSED~~] CONSENT AGREEMENT <br><br> (Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 to 1387) |

**WHEREAS**, Plaintiff California Sportfishing Protection Alliance (hereinafter "CSPA" or "Plaintiff") is a non-profit public benefit corporation dedicated to the preservation, protection, and defense of the environment, wildlife, and natural resources of California's waters;

**WHEREAS**, Defendant USA Waste of California, Inc. (hereinafter "USA Waste") owns and operates an approximately 7.7-acre solid waste hauling and recycling facility located at 11240 and 11260 Commercial Parkway in Castroville, California (the "Facility"), Defendant Jay Ramos ("Ramos") is the District Manager for the recycling operations at the Facility and Felipe Melchor ("Melchor") is the District Manager for the solid waste hauling operations at the Facility;

**WHEREAS,** unless otherwise noted, Defendant USA Waste of California, Inc., Jay Ramos, and Felipe Melchor shall hereinafter be referred to as "Defendants;"

**WHEREAS,** CSPA and Defendants collectively shall be referred to as the "Parties;"

**WHEREAS**, the Facility collects and discharges storm water into Tembladero Slough and into the County of Monterey's storm water drainage system, which discharges storm water from the Facility into the Tembladero Slough.  Tembladero Slough flows into the Salinas River, and ultimately into the Pacific Ocean (a map of the Facility is attached hereto as **Exhibit A** and incorporated herein by reference);

**WHEREAS**, storm water discharges associated with industrial activity are regulated pursuant to the National Pollutant Discharge Elimination System ("NPDES"), General Permit No. CAS000001 [State Water Resources Control Board], Water Quality Order No. 91-13-DWQ (as amended by Water Quality Order 92-12 DWQ and 97-03-DWQ), issued pursuant to Section 402 of the Clean Water Act, 33 U.S.C. § 1342 (hereinafter "General Permit");

**WHEREAS**, on or about April 25, 2012, Plaintiff provided notice of Defendants' alleged violations of the Act, and of its intention to file suit against Defendants ("Notice Letter"), to the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region IX; the Executive Director of the State Water Resources Control Board ("State Board"); the Executive Officer of the Regional Water Quality Control Board, Central Coast Region ("Regional Board"); and to Defendants, as required by the Act, 33 U.S.C. § 1365(b)(1)(A)  (a true and correct copy of CSPA's Notice Letter is attached hereto as **Exhibit B** and incorporated herein by reference);

**WHEREAS**, Defendants deny the occurrence of the violations alleged in the Notice Letter and maintain that Defendants and the Facility have complied at all times with the provisions of the General Permit;

**WHEREAS**, CSPA filed a complaint ("Complaint") against Defendants in the United States District Court, Northern District of California, on June 25, 2012;

**WHEREAS,** Defendants deny the allegations of the Complaint;

**WHEREAS**, for purposes of this Consent Agreement only, the Parties stipulate that venue is

proper in this Court, and that Defendants do not contest the exercise of jurisdiction by this Court to enter this Consent Agreement, but otherwise preserve all affirmative defenses in the event this Consent Agreement is not entered by this Court;

**WHEREAS**, this Consent Agreement shall be submitted to the United States Department of Justice for the 45-day statutory review period, pursuant to 33 U.S.C. § 1365(c); and shall thereafter be submitted for approval by the Court, the date of which approval shall be referred to herein as the "Court Approval Date;"

**WHEREAS,** at the time the Consent Agreement is submitted for approval to the United States District Court, CSPA shall request a dismissal of the Complaint with prejudice and the Parties shall stipulate and request that the Court retain jurisdiction for the enforcement of this Consent Agreement as provided herein;

**AND WHEREAS**, the Parties agree that it is in their mutual interest to resolve this matter without further litigation.

**NOW THEREFORE IT IS HEREBY STIPULATED BETWEEN THE PARTIES, AND ORDERED AND DECREED BY THE COURT, AS FOLLOWS:**

**I.      COMMITMENT OF USA WASTE**

**1.      Compliance With General Permit & Clean Water Act.**  Beginning immediately, and throughout the term of this Consent Agreement, USA Waste, as a corporate entity acting by and through its designated agent, representatives and/or employees, shall commence all measures needed to operate the Facility in full compliance with the requirements of the General Permit and the Clean Water Act, subject to any defenses available under the law.

**2.      USA Waste's Implementation of Specific Storm Water Best Management Practices.**  USA Waste shall complete the implementations of the following storm water control best management practices ("BMPs"):

(a)      Within 30 days after the Court Approval Date, USA Waste shall engage a qualified professional engineering firm to prepare a "Site Assessment and BMP Feasibility Study" to review

stormwater runoff drainages and pathways at the Facility, potential sources of specific pollutants, and the design capacity of the current stormwater management system.  This project must include:

   i.  Preparation of a facility map of sub-basin drainages;

   ii.  Preparation of a map and table identifying the square footage of the sub-basin drainage from which each drop inlet captures runoff;

   iii.  Sampling of drain inlet Nos. SD06, SD14, SD16, and SD17, as shown on **Exhibit A**, to evaluate the potential sources of TSS, Specific Conductivity, Iron, and Oil & Grease in stormwater, including the relative magnitude of each sub-basin's impact on stormwater;

   iv.  Identification of any the drop inlets whose flow capacity exceeds the capacity of the existing BMP, based on a 2-year, 1-hour storm event.

In addition, the "Site Assessment and BMP Feasibility Study" shall provide alternatives and recommendations for improving the Facility's stormwater management facilities and management practices, including alternatives and recommendations for immediate, short-term, and long-term operational, structural, and treatment BMPs.

  (b)  Based on the "Site Assessment and BMP Feasibility Study," USA Waste shall identify and select improvements to the Facility's stormwater management facilities and management practices.  On or before January 30, 2013, USA Waste shall provide to CSPA a copy of the "Site Assessment and BMP Feasibility Study" and a list of the selected improvements, including a proposed schedule for implementation of the selected improvements.

  (c)  USA Waste shall regularly monitor and maintain the storm water drainage system, BMPs and drop inlets for the Facility; document such maintenance; and maintain records thereof with the SWPPP for the Facility as required by the terms of the General Permit.  Further, USA Waste shall ensure that appropriate personnel are properly trained in storm water management and that records of any such storm water management training of Facility personnel shall also be maintained along with the SWPPP for the Facility;

  (d)  USA Waste shall repair and maintain all BMP treatment systems used at the Facility, including but not limited to (1) properly attaching all currently-installed drain inlet filter bags; (2)

- 4 -

placing filter bags in drain inlets as identified and recommended through the "Site Assessment and BMP Feasibility Study"; and (3) maintaining the inlet and bags.

(e)   Within 30 days after the Court Approval Date, USA Waste shall install a rainfall recording device at the Facility and maintain documentation along with the Facility SWPPP of the daily rainfall occurring at the Facility during the 2012-2013, 2013-2014, and 2014-2015 Wet Seasons.  In addition to the rainfall data gathered from the rainfall recording device described herein, USA Waste may elect to also maintain documentation of precipitation data recorded off-site at other nearby, reliable and objectively verifiable rainfall gauges (e.g., as found on a website maintained by a government agency);

(f)   Within 30 days after the Court Approval Date, USA Waste shall employ a regenerative sweeper on all paved surfaces of the Facility, including sweeping the entrance and 25 feet in both directions of the public street off-site or to the extent of any visible track-out, whichever is greater.  USA Waste will sweep the Facility three times per week during the 2012-2013, 2013-2014, and 2014-2015 Wet Seasons.  USA Waste shall sweep once a week during the Dry Season, during the life of this Consent Agreement.  USA Waste may decrease the frequency of sweeping after the 2013-2014 Wet Season if the Facility consistently meets all of the applicable benchmarks identified in **Exhibit C** attached hereto.

**3.**   **SWPPP Amendments/Additional BMPs.**  Within 30 days after the Court Approval Date, USA Waste shall formally amend the Storm Water Pollution Prevention Plan ("SWPPP") for the Facility to incorporate all of the relevant requirements of this Consent Agreement, as well as the revised Facility map attached hereto as **Exhibit A**.

**4.**   **Sampling Discharge Points.**  USA Waste shall collect samples during QSEs from each discharge point at the Facility, as required by the General Permit.

**5.**   **Sampling Frequency.**  USA Waste shall collect and analyze samples from four (4) Qualifying Storm Events[1] (to the extent that such QSEs occur) , in each Wet Season occurring during

---

[1] "Qualifying Storm Events" or "QSEs" under the General Permit are those events in which (i) the samples taken are preceded by at least three (3) working days during which no storm water discharges from the Facility have occurred; (ii) the samples are collected within the first hour that flow is

the term of this Consent Agreement (2012-2013; 2013-2014; 2014-2015), subject to a sufficient number of QSEs as defined herein occurring each Wet Season (including during the 2012-2013 Wet Season after the Court Approval Date).  The storm water sample results shall be compared with the values set forth in **Exhibit C**, attached hereto, and incorporated herein by reference.  If the results of any such samples exceed the parameter values set forth in **Exhibit C**, USA Waste shall comply with the "Action Memorandum" requirements set forth below.

6. **Sampling Parameters.**  All samples shall be analyzed for each of the constituents listed in **Exhibit C** by a laboratory accredited by the State of California.  All samples collected from the Facility shall be delivered to the laboratory as soon as practicable to ensure that sample "hold time" is not exceeded.  Analytical methods used by the laboratory shall be adequate to detect the individual constituents at or below the values specified on **Exhibit C**.  Sampling results shall be provided to CSPA within THIRTY (30) days of USA Waste's receipt of the laboratory report from each sampling event pursuant to the Notice provisions below.

7. **"Action Memorandum" Trigger; CSPA's Review Of "Action Memorandum"; Meet-and-Confer.**  If any sample taken during the three (3) Wet Seasons exceeds the benchmark levels set forth in **Exhibit C**, or if USA Waste fails to collect and analyze samples from the required number of storm events described herein, as qualified in the General Permit, or if USA Waste fails to timely comply with any of obligation set forth in this Consent Agreement, USA Waste shall prepare a written statement discussing the exceedance(s), the failure to collect and analyze samples from the required number of QSEs, and/or the failure to timely comply with any obligation set forth in this Consent Agreement ("Action Memorandum").  In the event that USA Waste' sampling evidences exceedances of any of the benchmark levels set forth in **Exhibit C**, the Action Memorandum shall discuss the possible cause(s) and/or source(s) of the exceedance(s), and what additional measures USA Waste will take to address and eliminate the problem and future exceedances.  In the event that USA Waste fails to collect and analyze samples from the required number of QSEs, the Action

observed at the Discharge Point being sampled; and (iii) the samples can be and are collected during daylight operating hours.  If the definition of QSE under the General Permit is amended or replaced during the term of this Agreement, the new definition of QSE shall apply.

[PROPOSED] CONSENT AGREEMENT

Memorandum shall discuss the possible cause(s) of this failure and additional measures that will be taken by USA Waste to ensure that USA Waste collects and analyzes samples from the required number of storm events the following Wet Season.  In the event that USA Waste fails to timely comply with any other obligation set forth in this Consent Agreement, the Action Memorandum shall discuss the possible reason(s) for this failure, and what actions USA Waste has taken and/or will take in the future to remedy the failure to timely comply with any obligation set forth herein.  The Action Memorandum shall be provided to CSPA not later than July 15 following the conclusion of each Wet Season occurring during the term of this Consent Agreement.  Recognizing that a SWPPP is an ongoing iterative process meant to encourage innovative BMPs, such additional measures may include, but are not limited to, making material improvements to the storm water collection and discharge system, changing the frequency or quality of Facility sweeping, changing the type and extent of storm water filtration media or modifying other industrial activities or management practices at the Facility.  Such additional measures proposed by USA Waste, to the extent feasible, shall be implemented immediately and in no event later than SIXTY (60) days after the due date of the Action Memorandum.  Within THIRTY (30) days of implementation of an additional BMP, the Facility SWPPP shall be amended to include all additional BMP measures designated in the Action Memorandum.  CSPA may review and comment on an Action Memorandum and suggest any additional pollution prevention measures it believes are appropriate; however, CSPA's failure to do so shall not be deemed to constitute agreement with the proposals set forth in the Action Memorandum. Upon request by CSPA, USA Waste agrees to meet and confer in good faith (at the Facility, if requested by CSPA) regarding the contents and sufficiency of the Action Memorandum.

      **8.**     **Inspections During The Term Of This Agreement.**  In addition to any site inspections conducted as part of the meet-and-confer process concerning an Action Memorandum as set forth above, USA Waste shall permit representatives of CSPA to perform up to three (3) physical inspections of the Facility during the term of this Consent Agreement.  These inspections shall be performed by CSPA's counsel and consultant(s) and may include sampling, photographing, and/or videotaping and if requested CSPA shall provide USA Waste with a copy of all sampling reports,

photographs and/or video.  CSPA shall provide at least forty-eight (48) hours advance notice of such physical inspection, except that USA Waste shall have the right to deny access if circumstances would make the inspection unduly burdensome and pose significant interference with business operations or any party/attorney, or the safety of individuals.  In such case, USA Waste shall specify at least three (3) dates within the two (2) weeks thereafter upon which a physical inspection by CSPA may proceed. USA Waste shall not make any alterations to Facility conditions during the period between receiving CSPA's initial forty-eight (48) hour advance notice and the start of CSPA's inspection that USA Waste would not otherwise have made but for receiving notice of CSPA's request to conduct a physical inspection of the Facility, excepting any actions taken in compliance with any applicable laws or regulations.  Nothing herein shall be construed to prevent USA Waste from continuing to implement any BMPs identified in the SWPPP during the period prior to an inspection by CSPA or at any time.

       **9.**      **USA Waste' Communications with Regional and State Boards.**  During the term of this Consent Agreement, USA Waste shall provide CSPA with copies of all documents submitted to or received from the Regional Board or the State Board concerning storm water discharges from the Facility and/or USA Waste's compliance or lack of compliance with the General Permit, including, but not limited to, all documents and reports submitted to the Regional Board and/or State Board as required by the General Permit.  All such material documents and reports shall be provided to CSPA pursuant to the Notice provisions set forth below at the time that USA Waste submits its Annual Report to the Regional Board.

       **10.**      **SWPPP Amendments.**  Pursuant to the Notice provisions set forth below, USA Waste shall provide CSPA with a copy of any amendments to the Facility SWPPP made during the term of the Consent Agreement, including the amendments required under Paragraph 3 herein, within fourteen (14) days of such amendment.

**II.**    **MITIGATION, COMPLIANCE MONITORING AND FEES AND COSTS**

       **1.**      **Mitigation Payment In Lieu Of Civil Penalties.**  As mitigation of the Clean Water Act violations alleged in CSPA's Complaint, USA Waste agrees to pay the sum of THIRTY-TWO

THOUSAND DOLLARS ($32,000) within SEVEN (7) business days after the Court Approval Date to the Rose Foundation for Communities and the Environment ("Rose Foundation") for projects to improve water quality in local watersheds of Monterey County. Payment shall be provided to the Rose Foundation by mailing it to: Rose Foundation, Attn: Tim Little, 6008 College Avenue, Suite #10, Oakland, CA 94618.

2. **Compliance Monitoring Funding.** To defray CSPA's reasonable investigative, expert, consultant and attorneys' fees and costs associated with monitoring USA Waste's compliance with this Consent Agreement, USA Waste agrees to reimburse CSPA for its reasonable fees and costs incurred up to but not exceeding the sum of FOUR THOUSAND DOLLARS ($4,000) during the term of this Consent Agreement. CSPA shall use these funds to conduct site inspections, review water quality sampling reports, review Annual Reports, discussions with representatives of USA Waste concerning the Action Memoranda referenced above, participate in meet and confer sessions and to review potential changes to the compliance requirements herein. USA Waste shall submit a check made payable to the "Law Offices of Andrew L. Packard Attorney-Client Trust Account" within TWENTY (20) days of the Court Approval Date.

3. **Fees & Costs.** USA Waste agrees to reimburse CSPA in the amount of THIRTY-FOUR THOUSAND DOLLARS ($34,000) to defray CSPA's reasonable investigative, expert, consultant and attorneys' fees and costs, and all other costs incurred as a result of investigating the activities at the Facility, bringing the Action and negotiating a resolution in the public interest. Such payment shall be made to the "Law Offices of Andrew L. Packard Attorney-Client Trust Account" within TWENTY (20) days after the Court Approval Date. CSPA agrees to accept such payment in full satisfaction of any and all claims it may have against any and all Defendants for all such fees and costs incurred in this action up to the Effective Date of this Consent Decree.

III. **DISPUTE RESOLUTION AND ENFORCEMENT OF CONSENT AGREEMENT**

1. With the exception of the timelines set forth above for addressing exceedances of values specified on **Exhibit C** and Action Memoranda, if a dispute under this Consent Agreement arises, or either Party believes that a breach of this Consent Agreement has occurred, CSPA and USA

Waste **s**hall meet and confer within SEVEN (7) days of receiving written notification from the other Party of a request for a meeting to determine whether a violation has occurred and to develop a mutually agreed upon plan, including implementation dates, to resolve the dispute.  If CSPA and USA Waste fail to meet and confer, or the meet-and-confer does not resolve the issue, after at least seven days have passed after the meet-and-confer occurred or should have occurred, either Party shall be entitled to all rights and remedies under the law, including filing a motion with the District Court of California, Northern District, which shall retain jurisdiction over the Action for the limited purposes of enforcement of the terms of this Consent Agreement.  CSPA and USA Waste shall be entitled to seek fees and costs incurred in any such motion, and such fees and costs may be awarded, pursuant to the provisions set forth in Section 505(d) of the Clean Water Act, 33 U.S.C. §1365(d), and applicable case law interpreting such provision.

     **2.**     **CSPA's Waiver and Release.**  Upon the Court Approval Date and entry of this Consent Agreement, CSPA, on its own behalf and on behalf of its members, subsidiaries, successors, assigns, directors, officers, agents, attorneys, representatives, and employees, releases Defendants and their officers, directors, employees, shareholders, parents, subsidiaries, and affiliates, and each of their predecessors, successors and assigns, and each of their agents, attorneys, consultants, and other representatives (each a "Released Defendant Party") from, and waives all claims which arise or could have arisen from or pertain to the Complaint or Notice Letter, including, without limitation, all claims for injunctive relief, damages, penalties, fines, sanctions, mitigation, fees (including fees of attorneys, experts, and others), costs, expenses or any other sum incurred or claimed or which could have been claimed in the Complaint or Notice Letter, for the alleged failure of Defendants to comply with the Clean Water Act at the Facility, up to the Effective Date of this Consent Agreement.

     During the term of the Consent Agreement, CSPA agrees that neither CSPA, its officers, executive staff, or members of its governing board nor any organization under the control of CSPA, its officers, executive staff, or members of its governing board, will file any lawsuit against Defendants pertaining to the Facility seeking relief for alleged violations of the Clean Water Act or the General Permit.  CSPA further agrees that, during the term of the Consent Agreement, CSPA will not support

other lawsuits, by providing financial assistance, personnel time or other affirmative actions, against Defendants pertaining to the Facility that may be proposed by other groups that or individuals who would rely upon the citizen suit provision of the Clean Water Act to challenge Defendants' compliance with the Clean Water Act or General Permit.

**3.    Defendants' Waiver and Release.**  Defendants, on their own behalf and on behalf of those Released Defendant Parties under their control, release CSPA (and its officers, directors, employees, members, parents, subsidiaries, and affiliates, and each of their successors and assigns, and its agents, attorneys, and other representatives) from, and waive all claims which arise or could have arisen from or pertain to the Complaint or the Notice Letter, including all claims for fees (including fees of attorneys, experts, and others), costs, expenses or any other sum incurred or claimed or which could have been claimed for matters associated with or related to the Complaint or the Notice Letter up to the Effective Date of this Consent Agreement.

**4.**    Upon the Court Approval Date, the Parties shall file with the Court a Stipulation and Order that shall provide that:

a.    the Complaint and all claims therein shall be dismissed with prejudice pursuant to Federal Rule of Civil Procedure 41(a)(2); and

b.    the Court shall retain and have jurisdiction over CSPA and USA Waste with respect to disputes arising under this Agreement.

Nothing in this Consent Agreement shall be construed as a waiver of any Party's right to appeal from an order that arises from an action to enforce the terms of this Consent Agreement.  The Parties agree that Defendants Ramos and Melchor shall be dismissed from this matter with prejudice and that all obligations under this Consent Decree shall be those of USA Waste and CSPA, and not of Defendants Ramos or Melchor.

## IV.    MISCELLANEOUS PROVISIONS

**1.**    The Parties enter into this Consent Agreement for the purpose of avoiding prolonged and costly litigation.  Nothing in this Consent Agreement shall be construed as, and Defendants expressly do not intend to imply, an admission as to any fact, finding, issue of law, or violation of law,

- 11 -
[PROPOSED] CONSENT AGREEMENT

nor shall compliance with this Consent Agreement constitute or be construed as an admission by Defendants of any fact, finding, conclusion, issue of law, or violation of law.  However, this paragraph shall not diminish or otherwise affect the obligation, responsibilities, and duties of the Parties under this Consent Agreement.

2.      The Consent Agreement shall terminate on September 30, 2015.

3.      The Consent Agreement may be executed in one or more counterparts which, taken together, shall be deemed to constitute one and the same document.  An executed copy of this Consent Agreement shall be valid as an original.

4.      Signatures of the Parties transmitted by facsimile or email shall be deemed binding.

5.      In the event that any one of the provisions of this Consent Agreement is held by a court to be unenforceable, the validity of the enforceable provisions shall not be adversely affected.

6.      The language in all parts of this Consent Agreement, unless otherwise stated, shall be construed according to its plain and ordinary meaning.  This Consent Agreement shall be construed pursuant to California law, without regard to conflict of law principles.

7.      The undersigned are authorized to execute this Consent Agreement on behalf of their respective Parties and have read, understood and agreed to be bound by all of the terms and conditions of this Consent Agreement.

8.      All agreements, covenants, representations and warranties, express or implied, oral or written, of the Parties concerning the subject matter of this Consent Agreement are contained herein. This Consent Agreement and its attachments are made for the sole benefit of the Parties, and no other person or entity shall have any rights or remedies under or by reason of this Consent Agreement, unless otherwise expressly provided for therein.

9.      **Notices.**  Any notices or documents required or provided for by this Consent Agreement or related thereto that are to be provided to CSPA pursuant to this Consent Agreement shall be hand-delivered or sent by U.S. Mail, postage prepaid, and addressed as follows or, in the alternative, shall be sent by electronic mail transmission to the email addresses listed below:

Bill Jennings, Executive Director
California Sportfishing Protection Alliance

3536 Rainier Avenue
Stockton, CA 95204
E-mail: DeltaKeep@me.com

With copies sent to:

Andrew L. Packard
Erik M. Roper
Emily J. Brand
Law Offices of Andrew L. Packard
100 Petaluma Boulevard North, Suite 301
Petaluma, CA 94952
Tel:  (707) 763-7227
E-mail: Andrew@packardlawoffices.com
       Erik@packardlawoffices.com
       Emily@packardlawoffices.com

Any notices or documents required or provided for by this Consent Agreement or related thereto that are to be provided to USA Waste pursuant to this Consent Agreement shall be sent by U.S. Mail, postage prepaid, and addressed as follows or, in the alternative, shall be sent by electronic mail transmission to the email addresses listed below:

Xavier Ramos, District Manager
USA Waste of California, Inc., dba Carmel Marina Corp.
11260 Commercial Parkway
Castroville, CA 95012
Tel.: (831) 633-7878
XRamos@wm.com

With copies sent to:

John Lynn Smith, Esq.
Reed Smith, LLP
101 Second Street, Suite 1800
San Francisco, CA 94105
Tel: 415.659.4863
Fax: 415.391.8269
E-mail: jlsmith@reedsmith.com

Andrew M. Kenefick, Esq.
Senior Legal Counsel
Western Group Legal Department
Waste Management
720 Fourth Avenue, Ste. 400
Kirkland, WA 98033
Tel: (425) 825-2003
Fax: (866) 863-7961
Email: akenefick@wm.com

- 13 -

[PROPOSED] CONSENT AGREEMENT

1    Each Party shall promptly notify the other of any change in the above-listed contact information.

2       **10.**  Signatures of the Parties transmitted by facsimile or email shall be deemed binding.

3       **11.**  Neither CSPA nor USA Waste shall be considered to be in default in the performance

4    of any of its obligations when a failure to perform is due to a "Force Majeure." A Force Majeure

5    event is any circumstances beyond the Party's control, including, without limitation, any act of God,

6    war, fire, earthquake, flood, and restraint by court order or public authority. A Force Majeure event

7    does not include normal inclement weather, such as anything less than or equal to a 100 year/24-hour

8    storm event, or inability to pay. Any Party seeking to rely upon this paragraph shall have the burden

9    of establishing that it could not reasonably have been expected to avoid, and which by exercise of due

10   diligence has been unable to overcome, the Force Majeure.

11      **12.**  If for any reason the Court should decline to approve this Consent Agreement in the

12   form presented, the Parties shall use their best efforts to work together to modify the Consent

13   Agreement within thirty (30) days so that it is acceptable to the Court. If the Parties are unable to

14   modify this Consent Agreement in a mutually acceptable manner, this Consent Agreement shall

15   become null and void.

16      **13.**  This Consent Agreement shall be deemed to have been drafted equally by the Parties,

17   and shall not be interpreted for or against any Party on the ground that any such Party drafted it.

18      **14.**  This Consent Agreement and its attached exhibits contain all of the terms and

19   conditions agreed upon by the Parties relating to the matters covered by the Consent Agreement, and

20   supersede any and all prior and contemporaneous agreements, negotiations, correspondence,

21   understandings, and communications of the Parties, whether oral or written, respecting the matters

22   covered by this Consent Agreement. This Consent Agreement may be amended or modified only by a

23   writing signed by CSPA and USA Waste or their authorized representatives, and then by order of the

24   Court.

25      **15.**  Except in case of an emergency but subject to the regulatory authority of any applicable

26   governmental authority, any breach of or default under this Consent Agreement capable of being cured

27   shall be deemed cured if, within five (5) days of first receiving notice of the alleged breach or default,

28

[PROPOSED] CONSENT AGREEMENT

or within such other period approved in writing by the Party making such allegation, which approval shall not be unreasonably withheld, the party allegedly in breach or default has completed such cure or, if the breach or default can be cured but is not capable of being cured within such five (5) day period, has commenced and is diligently pursuing to completion such cure.

The Parties hereto enter into this Consent Agreement and respectfully submit it to the Court for its approval and entry as an Order and Final Judgment, provided, however that, pursuant to 33 U.S.C. § 1365(c)(3), the Court shall not enter this Consent Decree until 45 days after receipt of a copy of the proposed Consent Decree by the Attorney General and the Administrator of the U.S. Environmental Protection Agency.  If the Attorney General and the Administrator of the U.S. Environmental Protection Agency do not submit comments on the Consent Decree, the Parties shall notify the Court when the 45-day statutory review period has ended.

Dated: _____     California Sportfishing Protection Alliance

By: _____
Bill Jennings, Executive Director

Dated: _____     USA Waste of California, Inc.

By: _____
Robert E. Longo
Vice President and Assistant Secretary

Dated: _____     Jay Ramos

By: _____
Jay Ramos, Defendant

Dated: _____     Felipe Melchor

By: _____
Felipe Melchor, Defendant

- 15 -

1  or within such other period approved in writing by the Party making such allegation, which approval

2  shall not be unreasonably withheld, the party allegedly in breach or default has completed such cure

3  or, if the breach or default can be cured but is not capable of being cured within such five (5) day

4  period, has commenced and is diligently pursuing to completion such cure.

5      The Parties hereto enter into this Consent Agreement and respectfully submit it to the Court for

6  its approval and entry as an Order and Final Judgment, provided, however that, pursuant to 33 U.S.C.

7  § 1365(c)(3), the Court shall not enter this Consent Decree until 45 days after receipt of a copy of the

8  proposed Consent Decree by the Attorney General and the Administrator of the U.S. Environmental

9  Protection Agency.  If the Attorney General and the Administrator of the U.S. Environmental

10  Protection Agency do not submit comments on the Consent Decree, the Parties shall notify the Court

11  when the 45-day statutory review period has ended.

12

13  Dated: _3 Dec 2012_          California Sportfishing Protection Alliance

14

15                  By:  _Bill Jennings_

16                       Bill Jennings, Executive Director

17  Dated: _____       USA Waste of California, Inc.

18

19

20                  By:  _____

21                       Robert E. Longo
                         Vice President and Assistant Secretary

22

23  Dated: _____       Jay Ramos

24

25                  By:  _____

26                       Jay Ramos, Defendant

27

28  Dated: _____       Felipe Melchor

- 15 -
[PROPOSED] CONSENT AGREEMENT

1    or within such other period approved in writing by the Party making such allegation, which approval

2    shall not be unreasonably withheld, the party allegedly in breach or default has completed such cure

3    or, if the breach or default can be cured but is not capable of being cured within such five (5) day

4    period, has commenced and is diligently pursuing to completion such cure.

5        The Parties hereto enter into this Consent Agreement and respectfully submit it to the Court for

6    its approval and entry as an Order and Final Judgment, provided, however that, pursuant to 33 U.S.C.

7    § 1365(c)(3), the Court shall not enter this Consent Decree until 45 days after receipt of a copy of the

8    proposed Consent Decree by the Attorney General and the Administrator of the U.S. Environmental

9    Protection Agency. If the Attorney General and the Administrator of the U.S. Environmental

10    Protection Agency do not submit comments on the Consent Decree, the Parties shall notify the Court

11    when the 45-day statutory review period has ended.

12    Dated: _____      California Sportfishing Protection Alliance

13

14                        By: _____

15                              Bill Jennings, Executive Director

16    Dated: _11/30/2012_      USA Waste of California, Inc.

17

18                        By: _____

19                              Robert E. Longo
                             Vice President and Assistant Secretary

20

21    Dated: _____      Jay Ramos

22

23                        By: _____

24                              Jay Ramos, Defendant

25    Dated: _____      Felipe Melchor

26

27                        By: _____
                             Felipe Melchor, Defendant

28

1  or within such other period approved in writing by the Party making such allegation, which approval

2  shall not be unreasonably withheld, the party allegedly in breach or default has completed such cure

3  or, if the breach or default can be cured but is not capable of being cured within such five (5) day

4  period, has commenced and is diligently pursuing to completion such cure.

5        The Parties hereto enter into this Consent Agreement and respectfully submit it to the Court for

6  its approval and entry as an Order and Final Judgment, provided, however that, pursuant to 33 U.S.C.

7  § 1365(c)(3), the Court shall not enter this Consent Decree until 45 days after receipt of a copy of the

8  proposed Consent Decree by the Attorney General and the Administrator of the U.S. Environmental

9  Protection Agency.  If the Attorney General and the Administrator of the U.S. Environmental

10  Protection Agency do not submit comments on the Consent Decree, the Parties shall notify the Court

11  when the 45-day statutory review period has ended.

12  Dated: _____     California Sportfishing Protection Alliance

13

14                        By: _____

15                                Bill Jennings, Executive Director

16  Dated: _____     USA Waste of California, Inc.

17

18                        By: _____

19                                Robert E. Longo
                              Vice President and Assistant Secretary

20

21  Dated: **12/3/12**_____     Jay Ramos

22

23                        By: _____

24                                Jay Ramos, Defendant

25  Dated: **12-3-12**_____     Felipe Melchor

26

27                        By: _____

28                                Felipe Melchor, Defendant

- 15 -

[PROPOSED] CONSENT AGREEMENT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EXHIBIT A – Facility Site Map**



**FIGURE 2**

**SWPPP FACILITY SITE MAP**

CARMEL MARINA CORPORATION
MATERIALS RECYCLING FACILITY
11240 AND 11260 COMMERCIAL PARKWAY, CASTROVILLE, CA.

DATE: 06/25/12
FILENAME: SITE0612.DWG
PROJ. No. ...

CRAWFORD CONSULTING INC.

**EXHIBIT B – Notice Letter**



April 25, 2012

VIA CERTIFIED MAIL
RETURN RECEIPT REQUESTED

Jay Ramos, District Manager
Felipe Melchor, Facility Operator Contact
Eddie Pettit, Regional Board Communication Liaison
Elaina Smith, Facility Operator Contact
USA Waste of California, Inc., dba, Carmel Marina Corporation
11240 Commercial Parkway
Castroville, CA 95012

C T Corporation System, Agent for Service of Process
USA Waste of California, Inc.
818 W. Seventh Street
Los Angeles, CA 90017


**Re:     Notice of Violations and Intent to File Suit Under the Federal Water
          Pollution Control Act**

Dear Messrs. Ramos, Melchor, Pettit and Ms. Smith:

        I am writing on behalf of the California Sportfishing Protection Alliance
("CSPA") in regard to violations of the Clean Water Act ("the Act") occurring at the
USA Waste of California, Inc. waste transfer and recycling facility located at 11240
Commercial Parkway in Castroville, California ("the Facility").  USA Waste of
California, Inc. is doing business at the Facility under the fictitious business name of
Carmel Marina Corporation ("Carmel Marina").  The WDID identification number for
the Facility is 327I017456.[1]  CSPA is a non-profit public benefit corporation dedicated to
the preservation, protection and defense of the environment, wildlife and natural
resources of California waters and the Pacific Ocean.  This letter is being sent to you as

---

[1] Part of Facility formerly operated under WDID 327I015253, which was terminated on January 28, 2010.

Notice of Violation and Intent To File Suit
April 25, 2012
Page 2 of 18

the responsible owner, officer, or operator of the Facility.  Unless otherwise noted, USA Waste of California, Inc., Jay Ramos, Felipe Melchor, Eddie Pettit, and Elaina Smith shall hereinafter be collectively referred to as Carmel Marina.

This letter addresses Carmel Marina's unlawful discharges of pollutants from the Facility to the County of Monterey's storm water drainage system and Tembladero Slough, which then conveys storm water discharged from the Facility into the Salinas River, and then to the Pacific Ocean.  This letter addresses the ongoing violations of the substantive and procedural requirements of the Clean Water Act and National Pollutant Discharge Elimination System ("NPDES") General Permit No. CAS000001, State Water Resources Control Board Water Quality Order No. 91-13-DWQ, as amended by Order No. 97-03-DWQ ("General Permit" or "General Industrial Storm Water Permit").

Section 505(b) of the Clean Water Act provides that sixty (60) days prior to the initiation of a civil action under Section 505(a) of the Act (33 U.S.C. § 1365(a)), a citizen must give notice of intent to file suit.  Notice must be given to the alleged violator, the U.S. Environmental Protection Agency ("the EPA"), and the State in which the violations occur.

As required by the Clean Water Act, this Notice of Violation and Intent to File Suit provides notice of the violations that have occurred, and continue to occur, at the Facility.  Consequently, USA Waste of California, Inc., Allied Waste Systems, Inc., Waste Management of California, Inc., Jay Ramos, Felipe Melchor, Eddie Pettit and Elaina Smith are hereby placed on formal notice by CSPA that, after the expiration of sixty (60) days from the date of this Notice of Violation and Intent to File Suit, CSPA intends to file suit in federal court against USA Waste of California, Inc., Jay Ramos, Felipe Melchor, Eddie Pettit and Elaina Smith under Section 505(a) of the Clean Water Act (33 U.S.C. § 1365(a)), for violations of the Clean Water Act and the General Permit.  These violations are described more fully below.

I.      **Background.**

Carmel Marina owns and operates a waste transfer and recycling facility located in Castroville, California.  The Facility falls under Standard Industrial Classification ("SIC") Code 5093 ("Scrap Recycling Facilities"), 4953 ("Refuse Systems"), and 4212 ("Motor Freight Transportation and Warehousing").  The Facility is primarily used to receive, store, handle, recycle and transport waste and scrap materials.  Other activities at the Facility include the use and storage of heavy machinery and motorized vehicles, including trucks used to haul materials to, from and within the Facility.

Carmel Marina collects and discharges storm water from its approximately 6.7-acre Facility through at least four (4) discharge points into the County of Monterey's storm water drainage system and Tembladero Slough.  The storm water discharged by Carmel Marina then travels into the Salinas River, and finally into the Pacific Ocean.

Notice of Violation and Intent To File Suit
April 25, 2012
Page 3 of 18

The Tembladero Slough and Salinas River and its tributaries and the Pacific Ocean are waters of the United States within the meaning of the Clean Water Act.

The Central Coast Regional Water Quality Control Board ("Regional Board") has established water quality standards for waters in its region, in the "Water Quality Control Plan for the Central Coast Basin" ("Basin Plan"). The Basin Plan requires "[a]ll waters shall be maintained free of toxic substances in concentrations which are toxic to, or which produce detrimental physiological responses in, human, plant, animal, or aquatic life." The Basin Plan also requires "[t]he pH value shall neither be depressed below 6.5 nor raised above 8.3." *Id*. at III-5. Further, it prohibits the discharges of oil and grease, stating that "[w]aters shall not contain oils, greases, waxes, or other similar materials in concentrations that result in a visible film or coating on the surface of the water or on objects in the water, that cause nuisance, or that otherwise adversely affect beneficial uses." *Id*. at III-3.

The Basin Plan provides maximum contaminant levels ("MCLs") for organic concentrations and inorganic and fluoride concentrations, not to be exceeded in domestic or municipal supply. *Id*. at III-6 - III-7. It requires that water designated for use as domestic or municipal supply shall not exceed the following maximum contaminant levels: aluminum – 1.0 mg/L; arsenic - 0.05 mg/L; lead - 0.05 mg/L; and mercury - 0.002 mg/L. *Id*. at III-7. The EPA has also issued recommended water quality criterion MCLs, or Treatment Techniques, for mercury - 0.002 mg/L; lead – 0.015 mg/L; chromium – 0.1 mg/L; and, copper – 1.3 mg/L. The EPA has also issued a recommended water quality criterion for aluminum for freshwater aquatic life protection of 0.087 mg/L. In addition, the EPA has established a secondary MCL, consumer acceptance limit for aluminum - 0.05 mg/L to 0.2 mg/L and zinc - 5.0 mg/L. *See* http://www.epa.gov/safewater/ mcl.html. Finally, the California Department of Health Services has established the following MCL, consumer acceptance levels: aluminum – 1 mg/L (primary) and 0.2 mg/L (secondary); chromium – 0.5 mg/L (primary); copper – 1.0 mg/L (secondary); iron – 0.3 mg/L; and zinc – 5.0 mg/L. *See* California Code of Regulations, title 22, §§ 64431, 64449.

The California Toxics Rule ("CTR"), issued by the EPA in 2000, establishes numeric receiving water limits for certain toxic pollutants in California surface waters. 40 CFR § 131.38**.** The CTR establishes the following numeric limits for freshwater surface waters: arsenic – 0.34 mg/L (maximum concentration) and 0.150 mg/L (continuous concentration); chromium (III) – 0.550 mg/L (maximum concentration) and 0.180 mg/L (continuous concentration); copper – 0.013 mg/L (maximum concentration) and 0.009 mg/L (continuous concentration); lead – 0.065 mg/L (maximum concentration) and 0.0025 mg/L (continuous concentration).

The Regional Board has identified waters of the Central Coast as failing to meet water quality standards for pollutant/stressors such as unknown toxicity, numerous pesticides, and mercury. *See* www.swrcb.ca.gov/water_issues/programs/tmdl/docs/- 2002reg3303dlist.pdf. It identified that the Tembladero Slough fails to meet water

Notice of Violation and Intent To File Suit
April 25, 2012
Page 4 of 18

quality standards due to the pollutant/stressors chlorophyll-a, chlorpyrifos, diazinon, enterococcus, Escherichia coli, fecal coliform, nitrate, nutrients, pesticides, sediment toxicity, total coliform, turbidity and pH.  It identified that the Salinas River fails to meet water quality standards due to the pollutant/stressors chlorophyll-a, chlorpyrifos, diazinon, Escherichia coli, fecal coliform, low dissolved oxygen, nitrate, sediment toxicity, turbidity, unknown toxicity and pH.  Discharges of listed pollutants into an impaired surface water may be deemed a "contribution" to the exceedance of CTR, a water quality standard, and may indicate a failure on the part of a discharger to implement adequate storm water pollution control measures.  *See Waterkeepers Northern Cal. v. Ag Indus. Mfg., Inc.*, 375 F.3d 913, 918 (9th Cir. 2004); *see also Waterkeepers Northern Cal. v. Ag Indus. Mfg., Inc.*, 2005 WL 2001037 at *3, 5 (E.D. Cal., Aug. 19, 2005) (finding that a discharger covered by the General Industrial Storm Water Permit was "subject to effluent limitation as to certain pollutants, including zinc, lead, copper, aluminum and lead" under the CTR).

The General Permit incorporates benchmark levels established by EPA as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite best available technology economically achievable ("BAT") and best conventional pollutant control technology ("BCT").  The following benchmarks have been established for pollutants discharged by Carmel Marina: iron – 1.0 mg/L; pH – 6.0 – 9.0 s.u.; oil & grease – 15 mg/L;; and, total suspended solids – 100.0 mg/L.  The State Water Quality Control Board has also proposed adding a benchmark level for specific conductance - 200 μmhos/cm and total organic carbon – 110 mg/L.  Additional EPA benchmark levels have been established for other parameters that CSPA believes are being discharged from the Facility, including but not limited to, aluminum – 0.75 mg/L; arsenic – 0.16854 mg/L; cadmium – 0.0159 mg/L; copper – 0.0636 mg/L; cyanide – 0.0636 mg/L; chemical oxygen demand – 120 mg/L; lead – 0.0816 mg/L; magnesium – 0.0636 mg/L; manganese – 1.0 mg/L; mercury – 0.0024 mg/L; silver – 0.0318 mg/L; and zinc – 0.117 mg/L.

## II.   Carmel Marina Is Violating the Act by Discharging Pollutants From the Facility to Waters of the United States.

Under the Act, it is unlawful to discharge pollutants from a "point source" to navigable waters without obtaining and complying with a permit governing the quantity and quality of discharges.  *Trustees for Alaska v. EPA*, 749 F.2d 549, 553 (9th Cir. 1984). Section 301(a) of the Clean Water Act prohibits "the discharge of any pollutants by any person . . ." except as in compliance with, among other sections of the Act, Section 402, the NPDES permitting requirements.  33 U.S.C. § 1311(a).  The duty to apply for a permit extends to "[a]ny person who discharges or proposes to discharge pollutants. . . ." 40 C.F.R. § 122.30(a).

The term "discharge of pollutants" means "any addition of any pollutant to navigable waters from any point source."  33 U.S.C. § 1362(12).  Pollutants are defined to include, among other examples, a variety of metals, chemical wastes, biological

Notice of Violation and Intent To File Suit
April 25, 2012
Page 5 of 18

materials, heat, rock, and sand discharged into water.  33 U.S.C. § 1362(6).  A point source is defined as "any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, [or] conduit . . . from which pollutants are or may be discharged."  33 U.S.C. § 1362(14).  An industrial facility that discharges pollutants into a navigable water is subject to regulation as a "point source" under the Clean Water Act.  *Comm. to Save Mokelumne River v. East Bay Mun. Util. Dist.*, 13 F.3d 305, 308 (9th Cir. 1993).  "Navigable waters" means "the waters of the United States." 33 U.S.C. § 1362(7).  Navigable waters under the Act include man-made waterbodies and any tributaries or waters adjacent to other waters of the United States.  *See Headwaters, Inc. v Talent Irrigation Dist.*, 243 F.3d 526, 533 (9th Cir. 2001).

The Tembladero Slough, Salinas River and Pacific Ocean are waters of the United States.  Accordingly, Carmel Marina's discharges of storm water containing pollutants from the Facility are discharges to waters of the United States.

CSPA is informed and believes, and thereupon alleges, that Carmel Marina has discharged and continues to discharge pollutants from the Facility to waters of the United States every day that there has been or will be any measurable discharge of water from the Facility since April 25, 2007.  Each discharge on each separate day is a separate violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).  These unlawful discharges are ongoing.  Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, Carmel Marina is subject to penalties for violations of the Act since April 25, 2007.

## III.   Pollutant Discharges in Violation of the NPDES Permit.

Carmel Marina has violated and continues to violate the terms and conditions of the General Permit.  Section 402(p) of the Act prohibits the discharge of storm water associated with industrial activities, except as permitted under an NPDES permit such as the General Permit.  33 U.S.C. § 1342.  The General Permit prohibits any discharges of storm water associated with industrial activities that have not been subjected to BAT or BCT.  Effluent Limitation B(3) of the General Permit requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.  BAT and BCT include both nonstructural and structural measures.  General Permit, Section A(8). Conventional pollutants are TSS, Oil & Grease ("O&G"), pH, biochemical oxygen demand ("BOD"), and fecal coliform.  40 C.F.R. § 401.16.  All other pollutants are either toxic or nonconventional.  *Id.*; 40 C.F.R. § 401.15.

Further, Discharge Prohibition A(1) of the General Permit provides:  "Except as allowed in Special Conditions (D.1.) of this General Permit, materials other than storm water (non-storm water discharges) that discharge either directly or indirectly to waters of the United States are prohibited.  Prohibited non-storm water discharges must be either eliminated or permitted by a separate NPDES permit."  Special Conditions D(1) of the

Notice of Violation and Intent To File Suit
April 25, 2012
Page 6 of 18

General Permit sets forth the conditions that must be met for any discharge of non-storm water to constitute an authorized non-storm water discharge.

Receiving Water Limitation C(1) of the General Permit prohibits storm water discharges and authorized non-storm water discharges to surface or groundwater that adversely impact human health or the environment.  Receiving Water Limitation C(2) of the General Permit also prohibits storm water discharges and authorized non-storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

Based on its review of available public documents, CSPA is informed and believes: (1) that Carmel Marina continues to discharge pollutants in excess of benchmarks and (2) that Carmel Marina has failed to implement BMPs adequate to bring its discharge of these and other pollutants in compliance with the General Permit. Carmel Marina's ongoing violations are discussed further below.

**A.       Carmel Marina Has Discharged Storm Water Containing Pollutants in Violation of the Permit.**

Carmel Marina has discharged and continues to discharge storm water with unacceptable levels of Iron (Fe), Oil & Grease (O&G), Total Suspended Solids (TSS), pH and Specific Conductance (SC) in violation of the General Permit.  These high pollutant levels have been documented during significant rain events, including the rain events indicated in the table of rain data attached hereto as Attachment A.  Carmel Marina's Annual Reports and Sampling and Analysis Results confirm discharges of materials other than storm water and specific pollutants in violation of the Permit provisions listed above. Self-monitoring reports under the Permit are deemed "conclusive evidence of an exceedance of a permit limitation."  *Sierra Club v. Union Oil*, 813 F.2d 1480, 1493 (9th Cir. 1988).

The following discharges of pollutants from the Facility have violated Discharge Prohibitions A(1) and A(2) and Receiving Water Limitations C(1) and C(2) of the General Industrial Storm Water Permit:

**1.       Discharges of Storm Water Containing Iron (Fe) at Concentration in Excess of Applicable EPA Benchmark Value.**

| Date | Discharge Point | Parameter | Concentration in Discharge | Benchmark Value |
|------|-----------------|-----------|----------------------------|-----------------|
| 3/18/2011 | SW-1 | Fe | 6.5 mg/L | 1.0 mg/L |
| 1/13/2011 | SW-1 | Fe | 12.0 mg/L | 1.0 mg/L |
| 1/26/2010 | SW-1 | Fe | 3.8 mg/L | 1.0 mg/L |

Notice of Violation and Intent To File Suit
April 25, 2012
Page 7 of 18

| 10/13/2009 | SW-1 | Fe | 1.67 mg/L | 1.0 mg/L |
| 10/13/2009 | SW-2 | Fe | 3.14 mg/L | 1.0 mg/L |
| 2/6/2009 | SW-1 Loading Dock | Fe | 2.7 mg/L | 1.0 mg/L |
| 2/6/2009 | SW-2 Yard | Fe | 1.2 mg/L | 1.0 mg/L |
| 11/26/2008 | SW-2 Yard | Fe | 1.35 mg/L | 1.0 mg/L |
| 1/4/2008 | SW-1 | Fe | 4.24 mg/L | 1.0 mg/L |
| 1/4/2008 | SW-2 | Fe | 3.46 mg/L | 1.0 mg/L |

2.      **Discharge of Storm Water Containing Oil & Grease at Concentration in Excess of EPA Benchmark Value.**

| Date | Discharge Point | Parameter | Concentration in Discharge | Benchmark Value |
|---|---|---|---|---|
| 1/4/2008 | SW-1 | O&G | 16 mg/L | 15 mg/L |

3.      **Discharges of Storm Water Containing Total Suspended Solids (TSS) at Concentration in Excess of Applicable EPA Benchmark Value.**

| Date | Discharge Point | Parameter | Concentration in Discharge | Benchmark Value |
|---|---|---|---|---|
| 3/18/2011 | SW-1 | TSS | 150 mg/L | 100 mg/L |
| 1/13/2011 | SW-1 | TSS | 280 mg/L | 100 mg/L |
| 1/26/2010 | SW-1 | TSS | 205 mg/L | 100 mg/L |
| 10/13/2009 | SW-2 | TSS | 119 mg/L | 100 mg/L |
| 2/6/2009 | SW-1 | TSS | 106 mg/L | 100 mg/L |
| 2/6/2009 | SW-2 | TSS | 116 mg/L | 100 mg/L |
| 2/6/2009 | SW-1 Yard | TSS | 127 mg/L | 100 mg/L |
| 12/15/2009 | SW-1 | TSS | 555 mg/L | 100 mg/L |

Notice of Violation and Intent To File Suit
April 25, 2012
Page 8 of 18

| 12/15/2009 | SW-2 | TSS | 409 mg/L | 100 mg/L |
|---|---|---|---|---|
| 11/26/2008 | SW-2 Yard | TSS | 107 mg/L | 100 mg/L |
| 1/4/2008 | SW-1 | TSS | 705 mg/L | 100 mg/L |
| 1/4/2008 | SW-2 | TSS | 575 mg/L | 100 mg/L |
| 10/12/2007 | SW-1 | TSS | 259 mg/L | 100 mg/L |
| 10/12/2007 | SW-2 | TSS | 421 mg/L | 100 mg/L |

**4.      Discharges of Storm Water Containing Specific Conductance (SC) at Concentration in Excess of Proposed EPA Benchmark Value.**

| Date | Discharge Point | Parameter | Concentration in Discharge | Proposed Benchmark Value |
|---|---|---|---|---|
| 1/13/2011 | SW-1 | SC | 890 μmhos/cm | 200 μmhos/cm |
| 1/26/2010 | SW-1 | SC | 416 μmhos/cm | 200 μmhos/cm |
| 2/6/2009 | SW-2 Yard | SC | 645 μmhos/cm | 200 μmhos/cm |
| 12/15/2009 | SW-1 | SC | 213 μmhos/cm | 200 μmhos/cm |
| 12/15/2009 | SW-2 | SC | 213 μmhos/cm | 200 μmhos/cm |

**5.      Discharge of Storm Water Containing pH at Concentration in Excess of EPA Benchmark Value.**

| Date | Discharge Point | Parameter | Concentration in Discharge | Benchmark Value |
|---|---|---|---|---|
| 1/26/2010 | SW-1 | pH | 10.2 mg/L | 6.0 – 9.0 s.u. |

CSPA's investigation, including its review of Carmel Marina's analytical results documenting pollutant levels in the Facility's storm water discharges well in excess of

Notice of Violation and Intent To File Suit
April 25, 2012
Page 9 of 18

EPA's benchmark values and the State Board's proposed benchmark levels for specific conductivity, indicates that Carmel Marina has not implemented BAT and BCT at the Facility for its discharges of Iron (Fe), Oil & Grease (O&G), Total Suspended Solids (TSS), pH and Specific Conductance (SC) and other pollutants, in violation of Effluent Limitation B(3) of the General Permit.  Carmel Marina was required to have implemented BAT and BCT by no later than October 1, 1992 or the start of its operations.  Thus, Carmel Marina is discharging polluted storm water associated with its industrial operations without having implemented BAT and BCT.

CSPA is informed and believes that Carmel Marina has known that its storm water contains pollutants at levels exceeding EPA Benchmarks and other water quality criteria since at least April 25, 2007.  CSPA alleges that such violations also have occurred and will occur on other rain dates, including during every single significant rain event that has occurred since April 25, 2007, and that will occur at the Facility subsequent to the date of this Notice of Violation and Intent to File Suit.  Attachment A, attached hereto, sets forth each of the specific rain dates on which CSPA alleges that Carmel Marina has discharged storm water containing impermissible levels of Iron (Fe), Oil & Grease (O&G), Total Suspended Solids (TSS), pH and Specific Conductance (SC) and other unmonitored pollutants (e.g. aluminum (Al), copper (Cu), lead (Pb), zinc (Zn), and chemical oxygen demand (COD)) in violation of Discharge Prohibitions A(1) and A(2) and Receiving Water Limitations C(1) and C(2) of the General Permit.

These unlawful discharges from the Facility are ongoing.  Each discharge of storm water containing any pollutants from the Facility without the implementation of BAT/BCT constitutes a separate violation of the General Permit and the Act.  Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, Carmel Marina is subject to penalties for violations of the General Permit and the Act since April 25, 2007.

**B.      Carmel Marina Has Failed to Implement an Adequate Monitoring & Reporting Plan.**

Section B of the General Industrial Storm Water Permit requires that dischargers develop and implement an adequate Monitoring and Reporting Plan by no later than October 1, 1992 or the start of operations.  Sections B(3), B(4) and B(7) require that dischargers conduct regularly scheduled visual observations of non-storm water and storm water discharges from the Facility and to record and report such observations to the Regional Board.  Section B(5)(a) of the General Permit requires that dischargers "shall collect storm water samples during the first hour of discharge from (1) the first storm event of the wet season, and (2) at least one other storm event in the wet season.  All storm water discharge locations shall be sampled."  Section B(5)(c)(i) further requires that the samples shall be analyzed for total suspended solids, pH, specific conductance, and total organic carbon.  Oil and grease may be substituted for total organic carbon. Section B(5)(c)(ii) of the General Permit further requires dischargers to analyze samples for all "[t]oxic chemicals and other pollutants that are likely to be present in storm water

Notice of Violation and Intent To File Suit
April 25, 2012
Page 10 of 18

discharges in significant quantities."  Section B(10) of the General Permit provides that "facility operators shall explain how the facility's monitoring program will satisfy the monitoring program objectives of [General Permit] Section B.2."

Based on its investigation, CSPA is informed and believes that Carmel Marina has failed to develop and implement an adequate Monitoring & Reporting Plan.  First, based on its review of publicly available documents, CSPA is informed and believes that Carmel Marina has failed to collect storm water samples during at least two qualifying storms events, as defined by the General Permit, during each of the past five Wet Seasons.  Second, based on its review of publicly available documents, CSPA is informed and believes that Carmel Marina has failed to conduct the monthly visual monitoring of storm water discharges and the quarterly visual observations of unauthorized non-storm water discharges required under the General Permit during each of the past five Wet Seasons.  Third, based on its review of publicly available documents, CSPA is informed and believes that for the past five Wet Seasons Carmel Marina has failed to analyze samples for the pollutants that the General Permit requires Carmel Marina to analyze, based on its SIC Code 4953, which includes iron (Fe), and SIC Code 5093, which includes aluminum (Al), copper (Cu), iron (Fe), lead (Pb), zinc (Zn), and chemical oxygen demand (COD).  Fourth, based on its review of publicly available documents, CSPA is informed and believes that for the past five Wet Seasons Carmel Marina has failed to analyze samples for other pollutants that are likely to be present in significant quantities in the storm water discharged from the Facility.  Each of these failures constitutes a separate and ongoing violation of the General Permit and the Act. Consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, Carmel Marina is subject to penalties for violations of the General Permit and the Act since April 25, 2007.  These violations are set forth in greater detail below:

1.  **Carmel Marina Has Failed to Collect Storm Water Samples During at Least Two Rain Events In Each of the Last Five Wet Seasons.**

Based on its review of publicly available documents, CSPA is informed and believes that Carmel Marina has failed to collect storm water samples from all discharge points during at least two qualifying rain events at the Facility during each of the past five Wet Seasons, as required by the General Permit.  For example, CSPA notes that the Annual Report filed by Carmel Marina for the Facility for the 2010-2011 Wet Season reported that Carmel Marina analyzed samples of storm water discharged during two qualifying storm events that season.  However, upon closer scrutiny it turns out that one storm sampled was not a qualifying storm event within the meaning of the General Permit.  Similarly, in the 2009-2010 Annual Report, Carmel Marina sampled from a storm event that was not a qualifying storm event, either (discussed further below).

Carmel Marina reported in all five Wet Seasons (i.e., 2006-2007; 2007-2008; 2008-2009; 2009-2010; and 2010-2011 Wet Seasons), that the Facility sampled the first

qualifying storm event of the season, when in fact it only sampled the first storm of the season during one Wet Season.  For example, Carmel Marina reported in its 2010-2011 Annual Report that it sampled the first qualifying storm event of the Wet Season, but Carmel Marina's first sample was collected on January 13, 2011.  Based upon its review of publicly available rainfall data, CSPA is informed and believes that the first qualifying storm event of the 2010-2011 Wet Season occurred as early as Monday, October 17, 2010, when 0.19" of rain fell on the Facility.  This failure to adequately monitor storm water discharges constitutes separate and ongoing violations of the General Permit and the Act.

2.     **Carmel Marina Has Failed to Collect Storm Water Samples from Each Discharge Point During at Least Two Rain Events In Each of the Last Five Wet Seasons.**

Based on its review of publicly available documents, CSPA is informed and believes that Carmel Marina has failed to collect storm water samples from all discharge points during at least two qualifying rain events at the Facility during each of the past five Wet Seasons.  For example, in the 2010-2011 Wet Season, Carmel Marina only sampled from one discharge point, while in the 2009-2010 Wet Season, it sampled two discharge points.  There is evidence in the Annual Reports that Carmel Marina has sampled up to five different locations over the last five years.  Further, based on its investigation, CSPA is informed and believes that storm water discharges from the Facility at points other than the one sampling/discharge point currently designated by Carmel Marina.  This failure to adequately monitor storm water discharges constitutes separate and ongoing violations of the General Permit and the Act.

3.     **Carmel Marina Has Failed to Conduct the Monthly Wet Season Observations of Storm Water Discharges Required by the General Permit.**

The General Permit requires dischargers to "visually observe storm water discharges from one storm event per month during the Wet Season (October 1 – May 30)."  General Permit, Section B(4)(a).  As evidenced by the entries on Form 4 Monthly Visual Observations contained in Carmel Marina's annual reports for the last five Wet Seasons, CSPA is informed and believes that Carmel Marina has failed to comply with this requirement of the General Permit.

Specifically, Carmel Marina failed to conduct monthly visual observations of discharges from qualifying storm events for most months during any of the past five Wet Seasons.  Instead, Carmel Marina documented its visual observations of storm water that discharged during non-qualifying storm events or on dates during which no rain fell on the Facility, for most months during the entire Wet Season of each of the past five years (discussed further below).  However, based on publicly available rainfall data, CSPA is informed and believes that there were many qualifying storm events during each of these Wet Seasons that Carmel Marina could have observed.

For example, Carmel Marina reported in its 2010-2011 Annual Report that it observed a qualifying storm event on Wednesday December 22, 2010.  However, CSPA is informed and believes that this could not possibly be true because 0.27" of rain fell on the Facility two days prior, on December 20, 2010, likely making that December 20th storm a qualifying storm event and disqualifying all storm events for the next three days. Carmel Marina's failure to conduct this required monthly Wet Season visual monitoring extends back to at least April 25, 2007.  Carmel Marina's failure to conduct this required monthly Wet Season visual monitoring has caused and continues to cause multiple, separate and ongoing violations of the General Permit and the Act.

### 4.    Carmel Marina Is Subject to Penalties for Its Failure to Implement an Adequate Monitoring & Reporting Plan Since April 25, 2007.

CSPA is informed and believes that publicly available documents demonstrate Carmel Marina's consistent and ongoing failure to implement an adequate Monitoring Reporting Plan in violation of Section B of the General Permit.  For example, while in its 2010-2011 Annual Report Carmel Marina reported having collected samples of storm water discharged during two qualifying storm events, only one storm event was a qualifying storm event within the meaning of the General Permit.  Based on its review of publicly available rainfall data, CSPA is informed and believes that the storm that occurred at the Facility on March 18, 2011 was not a qualifying storm event because enough rain fell on the Facility two days prior to likely result in a discharge of storm water from the Facility, thereby invalidating the March 18th storm as a qualifying storm event.  Specifically, Carmel Marina sampled a rain event on March 18, 2011 that produced 0.73" of rainfall on the Facility.  However, two days prior, on Wednesday, March 16, 2011, 0.08" of rain fell on the Facility.  As Carmel Marina sampled a storm event on January 13, 2011 during which 0.04" of rain fell on the Facility, it is likely that the March 16th storm event also produced enough rain for a discharge.  Therefore, the March 16th storm event likely renders any storm occurring for three days afterwards a non-qualifying storm event.

Additionally, Carmel Marina is in violation of the General Permit's requirement that the testing method employed in laboratory analyses of pollutant concentrations present in storm water discharged from the Facility be "adequate to satisfy the objectives of the monitoring program."  General Permit Section B.10.a.iii.  The Regional Board has

determined that the appropriate laboratory test method to employ when analyzing storm water samples for the presence and concentration of iron is EPA method 200.8. Additionally, the Regional Board has determined that the appropriate detection limit that should be applied when using EPA method 200.8 is 0.005 mg/L.

However, as demonstrated by Carmel Marina's annual report filed for each of the last five Wet Seasons (e.g., 2006-2007; 2007-2008; 2008-2009; 2009-2010; 2010-2011), the test method employed by the laboratory utilized by Carmel Marina to analyze the concentration of iron in the storm water discharged from its Facility was not EPA method 200.8, but rather, EPA method 200.7 or 3111B.  In addition, the laboratory employed by Carmel Marina to analyze the storm water sample collected for both samples applied an inappropriately high detection limit of 0.05 mg/L.

Carmel Marina is in violation of the General Permit for failing to employ laboratory test methods and detection limits that are adequate to, among other things, "ensure that storm water discharges are in compliance with the Discharge Prohibitions, Effluent Limitations, and Receiving Water Limitations specified in this General Permit." General Permit Section B.2.a. ("Monitoring Program Objectives").  Accordingly, consistent with the five-year statute of limitations applicable to citizen enforcement actions brought pursuant to the federal Clean Water Act, Carmel Marina is subject to penalties for these violations of the General Permit and the Act since April 25, 2007.

### C.      Carmel Marina Has Failed to Implement BAT and BCT.

Effluent Limitation B(3) of the General Permit requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.  BAT and BCT include both nonstructural and structural measures.  General Permit, Section A(8).  CSPA's investigation indicates that Carmel Marina has not implemented BAT and BCT at the Facility for its discharges of Iron (Fe), Oil & Grease (O&G), Total Suspended Solids (TSS), pH and Specific Conductance (SC) and other unmonitored pollutants in violation of Effluent Limitation B(3) of the General Permit.

To meet the BAT/BCT requirement of the General Permit, Carmel Marina must evaluate all pollutant sources at the Facility and implement the best structural and non-structural management practices economically achievable to reduce or prevent the discharge of pollutants from the Facility.  Based on the limited information available regarding the internal structure of the Facility, CSPA believes that at a minimum Carmel Marina must improve its housekeeping practices, store materials that act as pollutant sources under cover or in contained areas, treat storm water to reduce pollutants before discharge (e.g., with filters or treatment boxes), and/or prevent storm water discharge altogether.  Carmel Marina has failed to adequately implement such measures.

Carmel Marina was required to have implemented BAT and BCT by no later than October 1, 1992.  Therefore, Carmel Marina has been in continuous violation of the BAT

and BCT requirements every day since October 1, 1992, and will continue to be in violation every day that it fails to implement BAT and BCT.  Carmel Marina is subject to penalties for violations of the General Permit and the Act occurring since April 25, 2007.

### D.       Carmel Marina Has Failed to Develop and Implement an Adequate Storm Water Pollution Prevention Plan.

Section A(1) and Provision E(2) of the General Permit require dischargers of storm water associated with industrial activity to develop, implement, and update an adequate storm water pollution prevention plan ("SWPPP") no later than October 1, 1992.  Section A(1) and Provision E(2) requires dischargers who submitted an NOI pursuant to Water Quality Order No. 97-03-DWQ to continue following their existing SWPPP and implement any necessary revisions to their SWPPP in a timely manner, but in any case, no later than August 9, 1997.

The SWPPP must, among other requirements, identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm and non-storm water discharges from the facility and identify and implement site-specific best management practices ("BMPs") to reduce or prevent pollutants associated with industrial activities in storm water and authorized non-storm water discharges (General Permit, Section A(2)).  The SWPPP must also include BMPs that achieve BAT and BCT (Effluent Limitation B(3)).  The SWPPP must include: a description of individuals and their responsibilities for developing and implementing the SWPPP (General Permit, Section A(3)); a site map showing the facility boundaries, storm water drainage areas with flow pattern and nearby water bodies, the location of the storm water collection, conveyance and discharge system, structural control measures, impervious areas, areas of actual and potential pollutant contact, and areas of industrial activity (General Permit, Section A(4)); a list of significant materials handled and stored at the site (General Permit, Section A(5)); a description of potential pollutant sources including industrial processes, material handling and storage areas, dust and particulate generating activities, a description of significant spills and leaks, a list of all non-storm water discharges and their sources, and a description of locations where soil erosion may occur (General Permit, Section A(6)).

The SWPPP also must include an assessment of potential pollutant sources at the Facility and a description of the BMPs to be implemented at the Facility that will reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges, including structural BMPs where non-structural BMPs are not effective (General Permit, Section A(7), (8)).  The SWPPP must be evaluated to ensure effectiveness and must be revised where necessary (General Permit, Section A(9),(10)).  Receiving Water Limitation C(3) of the Order requires that dischargers submit a report to the appropriate Regional Water Board that describes the BMPs that are currently being implemented and additional BMPs that will be implemented to prevent or reduce the discharge of any pollutants causing or contributing to the exceedance of water quality standards.

CSPA's investigation and review of publicly available documents regarding conditions at the Facility indicate that Carmel Marina has been operating with an inadequately developed or implemented SWPPP in violation of the requirements set forth above.  Carmel Marina has failed to evaluate the effectiveness of its BMPs and to revise its SWPPP as necessary.  Accordingly, Carmel Marina has been in continuous violation of Section A(1) and Provision E(2) of the General Permit every day since October 1, 1992, and will continue to be in violation every day that it fails to develop and implement an effective SWPPP.  Carmel Marina is subject to penalties for violations of the General Permit and the Act occurring since April 25, 2007.

## E.      Carmel Marina Has Failed to Address Discharges Contributing to Exceedances of Water Quality Standards.

Receiving Water Limitation C(3) requires a discharger to prepare and submit a report to the Regional Board describing changes it will make to its current BMPs in order to prevent or reduce the discharge of any pollutant in its storm water discharges that is causing or contributing to an exceedance of water quality standards.  Once approved by the Regional Board, the additional BMPs must be incorporated into the Facility's SWPPP.  The report must be submitted to the Regional Board no later than 60-days from the date the discharger first learns that its discharge is causing or contributing to an exceedance of an applicable water quality standard.  Receiving Water Limitation C(4)(a).  Section C(11)(d) of the Permit's Standard Provisions also requires dischargers to report any noncompliance.  *See also* Provision E(6).  Lastly, Section A(9) of the Permit requires an annual evaluation of storm water controls including the preparation of an evaluation report and implementation of any additional measures in the SWPPP to respond to the monitoring results and other inspection activities.

As indicated above, Carmel Marina is discharging elevated levels of Iron (Fe), Oil & Grease (O&G), Total Suspended Solids (TSS), pH and Specific Conductance (SC) and other unmonitored pollutants that are causing or contributing to exceedances of applicable water quality standards.  For each of these pollutant exceedances, Carmel Marina was required to submit a report pursuant to Receiving Water Limitation C(4)(a) within 60-days of becoming aware of levels in its storm water exceeding the EPA Benchmarks and applicable water quality standards.

Based on CSPA's review of available documents, Carmel Marina was aware of high levels of these pollutants prior to April 25, 2007.  Likewise, Carmel Marina has generally failed to file reports describing its noncompliance with the General Permit in violation of Section C(11)(d).  Lastly, the SWPPP and accompanying BMPs do not appear to have been altered as a result of the annual evaluation required by Section A(9). Carmel Marina has been in continuous violation of Receiving Water Limitation C(4)(a) and Sections C(11)(d) and A(9) of the General Permit every day since April 25, 2007, and will continue to be in violation every day it fails to prepare and submit the requisite reports, receives approval from the Regional Board and amends its SWPPP to include

Notice of Violation and Intent To File Suit
April 25, 2012
Page 16 of 18

approved BMPs.  Carmel Marina is subject to penalties for violations of the General
Permit and the Act occurring since April 25, 2007.

**F.     Carmel Marina Has Failed to File Timely, True and Correct Reports.**

Section B(14) of the General Permit requires dischargers to submit an Annual
Report by July 1st of each year to the executive officer of the relevant Regional Board.
The Annual Report must be signed and certified by an appropriate corporate officer.
General Permit, Sections B(14), C(9), (10).  Section A(9)(d) of the General Permit
requires the discharger to include in their annual report an evaluation of their storm water
controls, including certifying compliance with the General Industrial Storm Water
Permit.  *See also* General Permit, Sections C(9) and (10) and B(14).

CSPA's investigation indicates that Carmel Marina has submitted incomplete
Annual Reports and purported to comply with the General Permit despite significant
noncompliance at the Facility.  For example, Carmel Marina reported in every Annual
Report filed for the past five Wet Seasons (i.e., 2006-2007; 2007-2008; 2008-2009; 2009-
2010; and 2010-2011) that it observed storm water discharge occurring during the first
storm of every Wet Season.  However, as discussed above, based on CSPA's review of
publicly available rainfall data, CSPA believes this cannot possibly be true.

Further, Carmel Marina failed to sample from qualifying storm events in six out
of eight storm water samples collected during the last five Wet Seasons.  For example, as
discussed above, in 2010-2011, Carmel Marina sampled from a storm event on March 18,
2011 that was not a qualifying storm event.  Further, in the 2009-2010 Annual Report,
Carmel Marina reported that it sampled a qualifying storm event on January 26, 2010.
Based on its review of publicly available rainfall data, CSPA is informed and believes
that the storm that occurred at the Facility on January 26, 2010 was not a qualifying
storm event because enough rain fell on the Facility three days prior to likely result in a
discharge of storm water from the Facility, thereby invalidating the January 26, 2010
storm as a qualifying storm event.  Specifically, 0.53" of rain fell on the Facility on
Saturday, January 23, 2010.  Additionally, on Friday, January 22, 2010, i.e., two working
days prior, 0.83" of rain fell on the Facility.  Either way, the storm event that occurred at
the Facility on January 26, 2010 was not a qualifying storm event.

Further, Carmel Marina failed to comply with the monthly visual observations of
storm water discharges requirement for every single Annul Report filed for the Facility
for each of the last five years.  In the 2009-2010 Annual Report, Carmel Marina only
observed a single qualifying storm event within the meaning of the General Permit.  For
example, Carmel Marina reported that it observed a qualifying storm event on January
18, 2010.  However, based on publicly available rainfall data, CSPA is informed and
believes that this cannot possibly be true.  On Sunday, January 17, 2010, 0.26" of rain fell
on the Facility, likely invalidating the storm observed on January 18th.  In the 2010-2011
Annual Report, Carmel Marina reported that it observed discharge from a qualifying
storm event on Wednesday December 22, 2010.  However, based on publicly available

Notice of Violation and Intent To File Suit
April 25, 2012
Page 17 of 18

rainfall data, CSPA is informed and believes that this cannot possibly be true.  Two days
prior to December 22, on Monday, December 20, 0.27"of rain fell on the Facility, thereby
invalidating the December 22, 2010 storm as a qualifying storm event.

These are only a few examples of how Carmel Marina has failed to file
completely true and accurate reports.  As indicated above, Carmel Marina has failed to
comply with the Permit and the Act consistently for at least the past five years; therefore,
Carmel Marina has violated Sections A(9)(d), B(14) and C(9) & (10) of the Permit every
time Carmel Marina submitted an incomplete or incorrect annual report that falsely
certified compliance with the Act in the past years.  Carmel Marina's failure to submit
true and complete reports constitutes continuous and ongoing violations of the Permit and
the Act.  Carmel Marina is subject to penalties for violations of Section (C) of the
General Permit and the Act occurring since April 25, 2007.

**IV.    Persons Responsible for the Violations.**

CSPA puts USA Waste of California, Inc., Jay Ramos, Felipe Melchor, Eddie
Pettit, and Elaina Smith on notice that they are the persons responsible for the violations
described above.  If additional persons are subsequently identified as also being
responsible for the violations set forth above, CSPA puts USA Waste of California, Inc.,
Jay Ramos, Felipe Melchor, Eddie Pettit, and Elaina Smith on notice that it intends to
include those persons in this action.

**V.    Name and Address of Noticing Party.**

Our name, address and telephone number is as follows:  California Sportfishing
Protection Alliance, Bill Jennings, Executive Director; 3536 Rainier Avenue, Stockton,
CA 95204; Phone: (209) 464-5067.

**VI.    Counsel.**

CSPA has retained legal counsel to represent it in this matter.  Please direct all
communications to:

Andrew L. Packard                                  Tel. (707) 763-7227
Erik M. Roper                                          Fax. (707) 763-9227
Emily J. Brand                                         Email:
Law Offices of Andrew L. Packard             Andrew@PackardLawOffices.com
100 Petaluma Boulevard, Suite 301            Erik@PackardLawOffices.com
Petaluma, CA 94952                                  Emily@PackardLawOffices.com

Notice of Violation and Intent To File Suit
April 25, 2012
Page 18 of 18

**VII.    Penalties.**

Pursuant to Section 309(d) of the Act (33 U.S.C. § 1319(d)) and the Adjustment of Civil Monetary Penalties for Inflation (40 C.F.R. § 19.4) each separate violation of the Act USA Waste of California, Inc., Jay Ramos, Felipe Melchor, Eddie Pettit, and Elaina Smith to a penalty of up to $32,500 per day per violation for all violations occurring after March 15, 2004, and $37,500 per day per violation for all violations occurring after January 12, 2009, during the period commencing five years prior to the date of this Notice of Violations and Intent to File Suit.  In addition to civil penalties, CSPA will seek injunctive relief preventing further violations of the Act pursuant to Sections 505(a) and (d) (33 U.S.C. §1365(a) and (d)) and such other relief as permitted by law.  Lastly, Section 505(d) of the Act (33 U.S.C. § 1365(d)), permits prevailing parties to recover costs and fees, including attorneys' fees.

CSPA believes this Notice of Violations and Intent to File Suit sufficiently states grounds for filing suit.  We intend to file a citizen suit under Section 505(a) of the Act against USA Waste of California, Inc., Jay Ramos, Felipe Melchor, Eddie Pettit, and Elaina Smith and their agents for the above-referenced violations upon the expiration of the 60-day notice period.  If you wish to pursue remedies in the absence of litigation, we suggest that you initiate those discussions within the next 20 days so that they may be completed before the end of the 60-day notice period.  We do not intend to delay the filing of a complaint in federal court if discussions are continuing when that period ends.

Sincerely,

Bill Jennings, Executive Director
California Sportfishing Protection Alliance

## **SERVICE LIST**

Lisa Jackson, Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

Jared Blumenfeld
Administrator, U.S. EPA – Region 9
75 Hawthorne Street
San Francisco, CA, 94105

Eric Holder
U.S. Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530-0001

Dorothy R. Rice, Executive Director
State Water Resources Control Board
1001 I Street Sacramento, CA 95814
P.O. Box 100
Sacramento, CA 95812-0100

Roger Briggs, Executive Officer
Regional Water Quality Control Board
Central Coast Region
895 Aerovista Place, Suite 101
San Luis Obispo, CA 93401

**ATTACHMENT A**
**Notice of Intent to File Suit, Carmel Marina (Castroville, CA)**
**Significant Rain Events,\* April 25, 2007 – April 25, 2012**

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| May | 02 | 2007 | Feb. | 16 | 2009 | Mar. | 10 | 2010 | Mar. | 06 | 2011 |
| May | 04 | 2007 | Feb. | 17 | 2009 | Mar. | 12 | 2010 | Mar. | 13 | 2011 |
| Oct | 12 | 2007 | Feb. | 21 | 2009 | Mar. | 30 | 2010 | Mar. | 16 | 2011 |
| Oct | 16 | 2007 | Feb. | 22 | 2009 | Mar. | 31 | 2010 | Mar. | 18 | 2011 |
| Oct | 19 | 2007 | Feb. | 23 | 2009 | April | 04 | 2010 | Mar. | 19 | 2011 |
| Nov | 10 | 2007 | Feb. | 26 | 2009 | April | 05 | 2010 | Mar. | 20 | 2011 |
| Nov | 11 | 2007 | Mar. | 01 | 2009 | April | 11 | 2010 | Mar. | 21 | 2011 |
| Dec. | 06 | 2007 | Mar. | 02 | 2009 | April | 12 | 2010 | Mar. | 22 | 2011 |
| Dec. | 07 | 2007 | Mar. | 03 | 2009 | April | 20 | 2010 | Mar. | 23 | 2011 |
| Dec. | 17 | 2007 | Mar. | 04 | 2009 | April | 21 | 2010 | Mar. | 24 | 2011 |
| Dec. | 18 | 2007 | Mar. | 21 | 2009 | April | 27 | 2010 | Mar. | 25 | 2011 |
| Dec. | 20 | 2007 | Mar. | 22 | 2009 | April | 28 | 2010 | Mar. | 26 | 2011 |
| Jan | 03 | 2008 | April | 07 | 2009 | May | 09 | 2010 | Apr | 13 | 2011 |
| Jan | 04 | 2008 | April | 08 | 2009 | May | 17 | 2010 | Apr | 20 | 2011 |
| Jan | 05 | 2008 | April | 09 | 2009 | May | 25 | 2010 | Apr | 24 | 2011 |
| Jan | 06 | 2008 | April | 23 | 2009 | Aug | 08 | 2010 | May | 07 | 2011 |
| Jan | 07 | 2008 | May | 01 | 2009 | Oct. | 17 | 2010 | May | 14 | 2011 |
| Jan | 09 | 2008 | May | 05 | 2009 | Oct. | 22 | 2010 | May | 15 | 2011 |
| Jan | 21 | 2008 | Oct. | 13 | 2009 | Oct. | 23 | 2010 | May | 16 | 2011 |
| Jan | 22 | 2008 | Oct. | 19 | 2009 | Oct. | 24 | 2010 | May | 17 | 2011 |
| Jan | 23 | 2008 | Dec. | 06 | 2009 | Oct. | 29 | 2010 | May | 28 | 2011 |
| Jan | 24 | 2008 | Dec. | 07 | 2009 | Nov. | 07 | 2010 | Jun | 03 | 2011 |
| Jan | 25 | 2008 | Dec. | 10 | 2009 | Nov. | 19 | 2010 | Jun | 04 | 2011 |
| Jan | 26 | 2008 | Dec. | 11 | 2009 | Nov. | 20 | 2010 | Jun | 28 | 2011 |
| Jan. | 27 | 2008 | Dec. | 12 | 2009 | Nov. | 21 | 2010 | Jul | 12 | 2011 |
| Jan. | 28 | 2008 | Dec. | 21 | 2009 | Nov. | 23 | 2010 | Oct | 03 | 2011 |
| Jan. | 29 | 2008 | Dec. | 26 | 2009 | Nov. | 27 | 2010 | Oct | 04 | 2011 |
| Jan. | 31 | 2008 | Dec. | 28 | 2009 | Dec. | 04 | 2010 | Oct | 05 | 2011 |
| Feb | 02 | 2008 | Jan. | 12 | 2010 | Dec. | 05 | 2010 | Oct | 06 | 2011 |
| Feb | 03 | 2008 | Jan. | 13 | 2010 | Dec. | 10 | 2010 | Nov | 03 | 2011 |
| Feb | 19 | 2008 | Jan. | 17 | 2010 | Dec. | 14 | 2010 | Nov | 04 | 2011 |
| Feb | 20 | 2008 | Jan. | 18 | 2010 | Dec. | 16 | 2010 | Nov | 05 | 2011 |
| Feb | 21 | 2008 | Jan. | 19 | 2010 | Dec. | 17 | 2010 | Nov | 06 | 2011 |
| Feb | 22 | 2008 | Jan. | 20 | 2010 | Dec. | 18 | 2010 | Nov | 11 | 2011 |
| Feb | 23 | 2008 | Jan. | 21 | 2010 | Dec. | 19 | 2010 | Nov | 19 | 2011 |
| Feb | 24 | 2008 | Jan. | 22 | 2010 | Dec. | 20 | 2010 | Nov | 20 | 2011 |
| Mar | 13 | 2008 | Jan. | 23 | 2010 | Dec. | 22 | 2010 | Jan | 20 | 2012 |
| Mar | 15 | 2008 | Jan. | 26 | 2010 | Dec. | 25 | 2010 | Jan | 21 | 2012 |
| Mar. | 28 | 2008 | Jan. | 29 | 2010 | Dec. | 28 | 2010 | Jan | 22 | 2012 |
| Apr. | 02 | 2008 | Feb | 04 | 2010 | Dec. | 29 | 2010 | Jan | 23 | 2012 |
| Apr. | 22 | 2008 | Feb | 05 | 2010 | Jan. | 01 | 2011 | Jan | 24 | 2012 |
| Apr. | 23 | 2008 | Feb. | 06 | 2010 | Jan. | 02 | 2011 | Jan | 25 | 2012 |
| Jan. | 02 | 2009 | Feb. | 08 | 2010 | Jan. | 13 | 2011 | Feb | 13 | 2012 |
| Jan. | 21 | 2009 | Feb. | 09 | 2010 | Jan. | 29 | 2011 | Feb | 15 | 2012 |
| Jan. | 22 | 2009 | Feb. | 12 | 2010 | Jan. | 30 | 2011 | Feb | 29 | 2012 |
| Jan. | 23 | 2009 | Feb. | 20 | 2010 | Feb. | 15 | 2011 | Mar | 13 | 2012 |
| Feb. | 05 | 2009 | Feb. | 21 | 2010 | Feb. | 16 | 2011 | Mar | 14 | 2012 |
| Feb. | 06 | 2009 | Feb. | 23 | 2010 | Feb. | 17 | 2011 | Mar | 16 | 2012 |
| Feb. | 08 | 2009 | Feb. | 24 | 2010 | Feb. | 18 | 2011 | Mar | 17 | 2012 |
| Feb. | 11 | 2009 | Feb. | 26 | 2010 | Feb. | 19 | 2011 | Mar | 18 | 2012 |
| Feb. | 12 | 2009 | Feb. | 27 | 2010 | Feb. | 24 | 2011 | Mar | 24 | 2012 |
| Feb. | 13 | 2009 | Mar. | 02 | 2010 | Feb. | 25 | 2011 | Mar | 25 | 2012 |
| Feb. | 14 | 2009 | Mar. | 03 | 2010 | Feb. | 26 | 2011 | Mar | 27 | 2012 |
| Feb. | 15 | 2009 | Mar. | 08 | 2010 | Mar. | 02 | 2011 | Mar | 31 | 2012 |

\* Dates gathered from publicly available rain and weather data collected at stations located near the Facility.

**ATTACHMENT A**
**Notice of Intent to File Suit, Carmel Marina (Castroville, CA)**
**Significant Rain Events,* April 25, 2007 – April 25, 2012**

Apr    10    2012
Apr    11    2012
Apr    12    2012
Apr    13    2012

* Dates gathered from publicly available rain and weather data collected at stations located near the
  Facility.

**EXHIBIT C - Sampling Parameters & Values**

| Parameter | Value |
|---|---|
| pH (Field test) | 6.0 – 9.0 s.u. |
| Specific Conductivity | 200 µmhos/cm |
| Total Suspended Solids | 100 mg/L |
| Oil & Grease | 15 mg/L |
| Aluminum, Total | 0.75 mg/L |
| Iron, Total | 1.0 mg/L |
| Copper, Total | 0.0636 mg/L |
| Lead, Total | 0.0816 mg/L |
| Zinc, Total | 0.117 mg/L |
| Chemical Oxygen Demand, Total | 120 mg/L |